**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | | |
|---|---|---|
| GWENDOLYN D. HICKS, | ) | No. CV 13-9477-PLA |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) | |
| Defendant. | ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on December 26, 2013, seeking review of the Commissioner's denial of her application for Disability Insurance Benefits ("DIB"). The parties filed Consents to proceed before the undersigned Magistrate Judge on January 16, 2014, and January 30, 2014. Pursuant to the Court's Order, the parties filed a Joint Stipulation on March 11, 2015, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## <u>BACKGROUND</u>

Plaintiff was born on May 28, 1963.  [Administrative Record ("AR") at 204.]  She has past relevant work experience as, among other things, a home attendant, medical record clerk, and teacher's aide II.  [AR at 99, 993-94.]

On October 28, 2008, plaintiff filed an application for a period of disability and DIB, alleging that she has been unable to work since July 31, 2008.  [AR at 86, 204-10.]  After her application was denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 62, 122-23.]  A hearing was held on September 1, 2010, at which time plaintiff appeared represented by an attorney, and testified on her own behalf. [AR at 9-54, 62.]  A vocational expert ("VE"), and plaintiff's husband, Harold Hicks, also testified. [AR at 30-53.]  On October 20, 2010, the ALJ issued a decision concluding that plaintiff was not under a disability from July 31, 2008, the alleged onset date, through October 20, 2010, the date of the decision.  [AR at 62-71.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 157-59.]

On November 10, 2011, the Appeals Council granted the request for review "under the substantial evidence provision" of the regulations, and issued a remand order vacating the hearing decision.  [AR at 76-80.]  The Appeals Council ordered the ALJ on remand to: (1) "[o]btain additional evidence concerning [plaintiff's] impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence"; (2) "[f]urther evaluate [plaintiff]'s mental impairments, without consideration of Dr. Yang's report at Exhibit 4F . . . by providing specific findings and appropriate rationale for each of the functional areas"; (3) "[f]urther evaluate [plaintiff]'s subjective complaints and provide rationale in accordance with the disability regulations"; (4) "[g]ive further consideration to [plaintiff]'s maximum residual functional capacity during the entire period at issue . . . and explain the weight given to [medical source] opinion evidence"; and (5) "[i]f warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of

1 | [plaintiff]'s limitations on [her] ability to perform any past relevant work." [AR at 78-79.]

2 | On May 16, 2012, another hearing was held before the same ALJ, at which time plaintiff

3 | again appeared represented by an attorney. [AR at 983-1002.] A different VE and a mental

4 | health expert testified, and an additional sixteen exhibits were made a part of the record. [AR at

5 | 598-982, 987-1002.] On July 10, 2012, the ALJ issued a decision concluding that plaintiff was not

6 | under a disability from July 31, 2008, the alleged onset date, through July 10, 2012, the date of

7 | the decision. [AR at 85-101.] Plaintiff requested review of the ALJ's decision by the Appeals

8 | Council. [AR at 7.] When the Appeals Council denied plaintiff's request for review on October 28,

9 | 2013 [AR at 1-5], the ALJ's decision became the final decision of the Commissioner. See Sam

10 | v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted). This action followed.

11 |

12 | **III.**

13 | **STANDARD OF REVIEW**

14 | Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's

15 | decision to deny benefits. The decision will be disturbed only if it is not supported by substantial

16 | evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622

17 | F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

18 | "Substantial evidence means more than a mere scintilla but less than a preponderance; it

19 | is such relevant evidence as a reasonable mind might accept as adequate to support a

20 | conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation

21 | and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998)

22 | (same). When determining whether substantial evidence exists to support the Commissioner's

23 | decision, the Court examines the administrative record as a whole, considering adverse as well

24 | as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted);

25 | see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must

26 | consider the entire record as a whole and may not affirm simply by isolating a specific quantum

27 | of supporting evidence.") (citation and internal quotation marks omitted). "Where evidence is

28 |

1  susceptible to more than one rational interpretation, the ALJ's decision should be upheld." <u>Ryan</u>,

2  528 F.3d at 1198 (citation and internal quotation marks omitted); <u>see</u> <u>Robbins v. Soc. Sec. Admin.</u>,

3  466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the

4  ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.")

5  (citation omitted).

6

7  **IV.**

8  **THE EVALUATION OF DISABILITY**

9         Persons are "disabled" for purposes of receiving Social Security benefits if they are unable

10  to engage in any substantial gainful activity owing to a physical or mental impairment that is

11  expected to result in death or which has lasted or is expected to last for a continuous period of at

12  least twelve months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir.

13  1992).

14

15  **A.**     **THE FIVE-STEP EVALUATION PROCESS**

16         The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

17  whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; <u>Lester v. Chater</u>, 81 F.3d 821,

18  828 n.5 (9th Cir. 1995), <u>as</u> <u>amended</u> April 9, 1996.  In the first step, the Commissioner must

19  determine whether the claimant is currently engaged in substantial gainful activity; if so, the

20  claimant is not disabled and the claim is denied.  <u>Id.</u>  If the claimant is not currently engaged in

21  substantial gainful activity, the second step requires the Commissioner to determine whether the

22  claimant has a "severe" impairment or combination of impairments significantly limiting her ability

23  to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  <u>Id.</u>

24  If the claimant has a "severe" impairment or combination of impairments, the third step requires

25  the Commissioner to determine whether the impairment or combination of impairments meets or

26  equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404,

27  subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  <u>Id.</u>  If

28

4

the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy.  Id.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since July 31, 2008, the alleged onset date.[1]  [AR at 88.]  At step two, the ALJ concluded that plaintiff has the severe impairments of rheumatoid arthritis, fibromyalgia, obesity, carpal tunnel syndrome, panic disorder with agoraphobia, depressive disorder, and anxiety state, unspecified.  [Id.]  At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listings.  [AR at 89.]  The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[2] to perform light work as defined in 20 C.F.R. § 404.1567(b),[3] except as follows:

---

[1]    The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through December 31, 2013.  [AR at 88.]

[2]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[3]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this (continued...)

1   [Plaintiff] can frequently use her hands.  She must avoid heights and hazards.  In
    addition, [plaintiff] can perform simple work.  [Plaintiff] must have no public contact
2   and can have occasional contact with peers and supervisors.

3   [AR at 92.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded

4   that plaintiff is unable to perform her past relevant work as a home attendant, medical records

5   clerk, demonstrator, and teacher's aide II.[4]  [AR at 99, 993-94.]  At step five, based on plaintiff's

6   RFC, vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in

7   significant numbers in the national economy that plaintiff can perform, including work as a

8   "production solderer" (Dictionary of Occupational Titles ("DOT") No. 813.684-022), "garment folder"

9   (DOT No. 789.687-066), and "ticketer" (DOT No. 229.587-018).  [AR at 100, 994-95.]  Accordingly,

10  the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of July

11  31, 2008, through July 10, 2012, the date of the decision.  [AR at 101.]

12

13                                          **V.**

14                              **THE ALJ'S DECISION**

15      Plaintiff contends that the ALJ erred when he:  (1) rejected the opinions of plaintiff's treating

16  physician, Samy Metyas, M.D., and treating psychiatrist, Nageswara R. Guntupalli, M.D.; (2)

17  rejected plaintiff's subjective symptom testimony; (3) determined plaintiff's RFC; (4) evaluated the

18  lay witness testimony of plaintiff's husband; and (5) determined that plaintiff could sustain work

19  activity and perform a significant number of jobs.  [Joint Stipulation ("JS") at 9.]

20  _____

21      [3](...continued)

22  category when it requires a good deal of walking or standing, or when it involves sitting most of the time
    with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or

23  wide range of light work, you must have the ability to do substantially all of these activities.  If someone
    can do light work, we determine that he or she can also do sedentary work, unless there are additional

24  limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. §
    404.1567(b).

25

26      [4]    In his 2010 decision, the ALJ determined that the past relevant work of home attendant,
    demonstrator, and teacher's aide were part-time and did not rise to the level of substantial gainful

27  activity.  [AR at 51-52.]  The position of "demonstrator" is included in the 2012 decision as past relevant
    work despite the fact that at the 2012 hearing the ALJ had indicated that he was going to exclude that

28  position.  [AR at 993-94.]

                                            6

1   As set forth below, the Court agrees with plaintiff, in part, and remands for further
2   proceedings.

3

4   **A.    MEDICAL OPINIONS**

5       **1.    Legal Standard**

6   "There are three types of medical opinions in social security cases:  those from treating
7   physicians, examining physicians, and non-examining physicians." <u>Valentine v. Comm'r of Soc.</u>
8   <u>Sec. Admin.</u>, 574 F.3d 685, 692 (9th Cir. 2009); <u>see</u> <u>also</u> 20 C.F.R. §§ 404.1502, 404.1527.  "As
9   a general rule, more weight should be given to the opinion of a treating source than to the opinion
10  of doctors who do not treat the claimant." <u>Lester</u>, 81 F.3d at 830; <u>Garrison v. Colvin</u>, 759 F.3d
11  995, 1012 (9th Cir. 2014) (citing <u>Ryan</u>, 528 F.3d at 1198); <u>Turner v. Comm'r of Soc. Sec.</u>, 613
12  F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to
13  greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830; <u>Ryan</u>, 528
14  F.3d 1198.

15  "[T]he ALJ may only reject a treating or examining physician's uncontradicted medical
16  opinion based on clear and convincing reasons." <u>Carmickle</u>, 533 F.3d at 1164 (citation and
17  internal quotation marks omitted); <u>Widmark v. Barnhart</u>, 454 F.3d 1063, 1066 (9th Cir. 2006).
18  "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate
19  reasons that are supported by substantial evidence in the record." <u>Carmickle</u>, 533 F.3d at 1164
20  (citation and internal quotation marks omitted); <u>Ryan</u>, 528 F.3d at 1198; <u>Ghanim v. Colvin</u>, 763
21  F.3d 1154, 1160-61 (9th Cir. 2014); <u>Garrison</u>, 759 F.3d at 1012.  The ALJ can meet the requisite
22  specific and legitimate standard "by setting out a detailed and thorough summary of the facts and
23  conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Reddick</u>, 157
24  F.3d at 725.  The ALJ "must set forth his own interpretations and explain why they, rather than the
25  [treating or examining] doctors', are correct." <u>Id.</u>

26

27

28

### 2.   Dr. Metyas

Dr. Metyas, a rheumatologist and plaintiff's treating physician from December 2007 through March 2012 [AR at 23, 397], saw plaintiff for her complaints of sleeping problems, numbness, joint pain, fatigue, back pain, muscle weakness, migraines, asthma, and night sweats, among other things.  [AR at 397-426, 469-90, 553-74, 724-891, 928-82.]  On December 5, 2007, Dr. Metyas noted that plaintiff had been diagnosed with fibromyalgia in 2006 by a different doctor, and Dr. Metyas agreed with the fibromyalgia diagnosis.  [AR at 410-13.]  In March 2009, Dr. Metyas included a diagnosis of mild rheumatoid arthritis.  [AR at 806-07.]  In September 2009, Dr. Metyas noted that plaintiff's rheumatoid arthritis was in remission.  [AR at 796-97.]  In November 2009, Dr. Metyas included depression and panic attacks in his assessment.  [AR at 803.]  In November 2010, Dr. Metyas' diagnoses included fibromyalgia, chronic fatigue, and carpal tunnel syndrome.  [AR at 756.]  In a treatment note dated March 8, 2012, Dr. Metyas diagnosed fibromyalgia (severe), carpal tunnel syndrome, chronic fatigue syndrome, and insomnia unspecified.  [AR at 930.]  Dr. Metyas treated plaintiff with medication and recommended a sleeping program, an exercise program, physical therapy, and life style modification.  [See, e.g., AR at 413, 930.]  Dr. Metyas recommended that plaintiff walk every day.  [AR at 930.][5]

On January 20, 2009, and February 17, 2010, Dr. Metyas completed certifications of disability, certifying that plaintiff was entitled to a temporary disability placard from the California Department of Motor Vehicles ("DMV").[6]  [AR at 94, 711-12, 763-64.]  In the January 2009 certification, Dr. Metyas requested a temporary placard valid until July 31, 2009, and certified that

---

[5]   Although the record includes a letter from the Social Security Administration to Dr. Metyas enclosing a blank Medical Source Statement of Ability To Do Work-Related Activities (Physical), there is no indication in the record that Dr. Metyas completed the form and returned it to the Social Security Administration.  [AR at 356-65.]

[6]   Evidence that plaintiff qualified for a temporary disability placard from the DMV is not determinative of disability under the Social Security Administration guidelines.  See Perry v. Astrue, 2011 WL 3903121, at *16 (N.D. Cal. Sept. 6, 2011) ("As to the DMV disabled driver certificate, such evidence is not determinative on the issue of disability because the DMV utilizes different criteria for issuing disabled placards which cannot be interchanged with the guidelines set forth by the Social Security Administration.") (citation omitted).

plaintiff met the requirements of a disabled person found in California Vehicle Code section 295.5 because she suffers from rheumatoid arthritis and fibromyalgia, which substantially impair or interfere with mobility and render her unable to move about without the aid of an assistive device. [AR at 712.]  In the February 2010 certification, Dr. Metyas requested a temporary placard valid until August 30, 2010, and certified that plaintiff met the requirements of a disabled person found in California Vehicle Code section 295.5 because she suffers from rheumatoid arthritis[7] and fibromyalgia, which substantially impair or interfere with mobility.  [AR at 763.]  He did not indicate in this certification that plaintiff was unable to move without an assistive device.  [Id.]

Additionally, on July 9, 2008, December 2, 2008, March 18, 2009, July 1, 2009, and November 24, 2010, in connection with plaintiff's application for disability benefits through the California Employment Development Department, Dr. Metyas opined that plaintiff could not perform her regular or customary work for up to three months after each form was signed.  [AR at 664, 711, 716, 756, 767.]  Dr. Metyas included the diagnoses of fibromyalgia, chronic fatigue, carpal tunnel syndrome, and rheumatoid arthritis, with findings of trigger points pain, muscle aches, depression, anxiety, fatigue, headache, night sweats, chest pain, abdominal pain, numbness, diarrhea/constipation, sore throat, and sleeping problems.  [Id.]

The ALJ gave "little weight" to Dr. Metyas' opinions, and instead gave "great weight" to the opinion of consultative examiner Sean To, M.D., who found that plaintiff could perform a range of light work.  [AR at 92, 94, 441-45].  The ALJ gave Dr. Metyas' opinion "little weight" for the following reasons:

> Dr. Metyas offered no supporting objective or diagnostic evidence.  Moreover, Dr. Metyas's treatment notes, as discussed above, do not support such restrictive assessments.  Dr. Metyas also provided his opinions by completing multiple forms and he did not provide[ ] a detailed explanation for his restrictive assessments. Indeed, the Regulations state that a medical opinion should be "complete and detailed enough for us to make a determination or decision about whether you are disabled or blind."  For example, a complete opinion would address the nature and severity of impairments, whether the impairments met the durational requirement, and the claimant's residual functional capacity.  Dr. Metyas's assessments, thus, do

---

[7]   The Court notes that by September 2009, several months prior to completing the second DMV disabled placard certification, Dr. Metyas had found plaintiff's rheumatoid arthritis to be in remission.  [AR at 796-97.]

1    not even rise to the level of a medical opinion.

2    [AR at 94 (citations omitted).]

3           As an initial matter, the Social Security regulations require deference to the treating

4    physician's opinions.  See 20 C.F.R. § 404.1527; Social Security Ruling ("SSR")[8] 96-2p, 1996 WL

5    374188, at *1 ("A finding that a treating source's medical opinion is not entitled to controlling

6    weight does not mean that the opinion is rejected."); Orn v. Astrue, 495 F.3d 625, 633 (9th Cir.

7    2007) ("Even if [the examining physician's] opinion were 'substantial evidence,' § 404.1527 still

8    requires deference to the treating physicians' opinions").

9           Here, the ALJ found that Dr. Metyas offered no objective or diagnostic evidence to support

10   his opinions.  [AR at 94.]  Dr. Metyas' forms referenced plaintiff's diagnosed impairments, and

11   findings of trigger point pain, muscle aches, depression, anxiety, fatigue, headache, night sweats,

12   chest pain, abdominal pain, numbness, diarrhea/constipation, sore throat, and a sleeping problem.

13   [AR at 664, 711-12, 716, 756, 767, 783.]  The Court notes, however, that although the supporting

14   evidence listed on the forms is minimal, Dr. Metyas' treatment records generally support these

15   findings.  See Kager v. Astrue, 256 Fed. App'x 919, 921 (9th Cir. 2007) ("While it is true that the

16   notes setting forth [the treating physician]'s opinion did not themselves refer to specific limitations

17   or clinical findings, [the treating physician]'s other treatment notes did contain objective findings

18   supporting her opinion that [plaintiff] was unable to perform past relevant work.]").]

19          Regarding Dr. Metyas' opinion that plaintiff could not perform her regular or customary work

20   due to her diagnosed conditions of fibromyalgia, chronic fatigue, carpal tunnel syndrome and

21   rheumatoid arthritis, Dr. Metyas' treatment notes generally support these diagnoses.[9]  [See, e.g.,

22   AR at 397-426, 470-90, 554-97, 659-891, 928-34.]  For example, the treatment notes reveal that

23

24   _____

25   [8]    "SSRs do not have the force of law.  However, because they represent the Commissioner's
     interpretation of the agency's regulations, we give them some deference.  We will not defer to SSRs
26   if they are inconsistent with the statute or regulations."  Holohan v. Massanari, 246 F.3d 1195, 1202
     n.1 (9th Cir. 2001) (internal citations omitted).

27   [9]    However, as noted above, as of September 2009, Dr. Metyas indicated that plaintiff's
28   rheumatoid arthritis was in remission.  [AR at 796-97.]

1    despite treatment with medication and water therapy, plaintiff had 18/18 tender points, severe

2    fatigue, sleeping problems, numbness, joint pain, and stiffness.  [AR at 397-426, 470-90, 585-86,

3    659-891.]  Plaintiff's fibromyalgia was frequently noted to be active and/or severe.[10]  [See, e.g.,

4    AR at 567-68, 580-81, 614, 668, 771, 793, 801, 803, 805, 827, 831.]  The Commissioner's

5    argument that Dr. Metyas consistently observed that plaintiff had normal neurological findings and

6    muscle strength, did not report abnormalities in plaintiff's gait or deformities in her joints, and

7    observed that plaintiff had normal strength, sensation, fine motor movements, and range of motion

8    during January and March 2012 examinations [JS at 20] is unpersuasive, because fibromyalgia

9    is diagnosed on the basis of reports of pain and other symptoms, not by any of these objective

10   tests.  See Benecke, 379 F.3d at 590, 594 n.4.  Here, the record reflects that Dr. Metyas'

11   treatment notes consistently mention plaintiff's complaints of pain [see, e.g., AR at 770, 774, 778,

12   784 (indicating "Pain sever[e], Can't live normal life," and "Pain all over"), 786, 788, 790, 792, 796,

13   798 ("Pain all time"); 800, 802 ("hands hurt[] a lot; . . . compression gloves . . . helped"), 804, 806,

14   808, 814 ("hand pain, pain all over"), 820 ("hands hurt[] on inside - difficult to turn a towel, . . . all

15   joint[s] froze, couldn't sit too long; joints lock up on her"), 822, 824, 830 (18/18 tender points on

16   December 5, 2007)], as well as fatigue, numbness, dizziness, joint pain, and sleeping problems.

17   [See, e.g., AR at 770, 774, 776, 778, 784, 786, 788, 790, 792.]

18        Accordingly, the Court concludes that the ALJ failed to provide specific and legitimate

19

20      [10]   Fibromyalgia is a syndrome that "is poorly understood within much of the medical community."
     Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (citation omitted).  Significantly, there is

21   no known cause or cure, and fibromyalgia "is diagnosed entirely on the basis of patients' reports of
     pain and other symptoms."  Id. at 590; Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996)

22   ("[Fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest importance to
     disability law, its symptoms are entirely subjective.").  Courts have noted that there are no laboratory

23   or diagnostic tests that can confirm the presence of fibromyalgia.  Benecke, 379 F.3d at 590 (citations
     omitted); Sarchet, 78 F.3d at 306; Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th Cir. 2003).

24   Hence, fibromyalgia is often diagnosed by eliminating other possible conditions and confirming the
     presence of the disease's symptoms: widespread pain existing for at least three months, fatigue,

25   disturbed sleep, stiffness, and tenderness in at least eleven of eighteen specified sites ("trigger points")
     on the body.  Brosnahan, 336 F.3d at 672 n.1 ("[d]iagnosis [of fibromyalgia] is usually made after

26   eliminating other conditions"); Preston v. Sec'y of Health and Human Servs., 854 F.2d 815, 818 (6th
     Cir. 1998) ("no objective tests . . . can conclusively confirm [fibromyalgia]"); Rollins v. Massanari, 261

27   F.3d 853, 855 (9th Cir. 2001) (listing fibromyalgia's symptoms (quoting Sarchet, 78 F.3d at 306)).

28

reasons for rejecting Dr. Metyas' opinion that plaintiff was unable to perform her regular or customary work. However, the ALJ's error in rejecting Dr. Metyas' opinion that plaintiff was unable to perform her regular or customary work is harmless because the ALJ nevertheless found at step four that plaintiff could not perform any past relevant work. Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1991) (harmless error rule applies to review of administrative decisions regarding disability).

### 3.   Dr. Guntupalli

Dr. Guntupalli, plaintiff's treating psychiatrist, treated plaintiff from January 16, 2007, through January 27, 2012. [AR at 427-32, 491-93, 621-28.] At the intake evaluation, dated January 16, 2007, Dr. Guntupalli noted plaintiff's complaints of panic attacks since June 2006, palpitations, trembling, shortness of breath, chest pain, dizziness, and fear of losing control. [AR at 431.] Dr. Guntupalli found that plaintiff had a depressed mood and a constricted affect, but no hallucinations; no delusions; normal associations; full alertness and orientation; good attention and concentration; good insight and judgment; and that her recent, short term, and long term memory, recall, ability to perform calculations, and proverb interpretation were all intact. [AR at 95, 432.] Dr. Guntupalli diagnosed plaintiff with panic disorder and a Global Assessment of Functioning ("GAF") score of 60.[11] [AR at 431-32.]

Dr. Guntupalli's treating records indicate depression and anxiety symptoms, and treatment of plaintiff with medication such as Prozac, Xanax, and Ambien. [AR at 429-30, 622, 625.] In June 2008, plaintiff's coping skills were noted to be poor. [AR at 625.] Treatment records from

---

[11] A GAF score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV"). A GAF score in the range of 51-60 indicates "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g, few friends, conflicts with peers or co-workers)." Id. 34. The most recent edition of the DSM "dropped" the GAF scale, citing its "conceptual lack of clarity" and "questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012) ("DSM-V").

October through December 2008, and March and May 2009, indicate depression due to family problems, and treatment with Cymbalta and Ultram with no side effects.  [AR at 492-93, 622.] Anxiety was noted in treatment notes dated June, August, and November 2008, and April 2011. [AR at 622, 625, 628.]  In July 2009, plaintiff indicated her mood was less depressed.  [AR at 624.] Plaintiff missed her appointments on October 30, 2009, November 6, 2009, and April 2, 2010.  [AR at 624.]   On November 8, 2010, Dr. Guntupalli noted that plaintiff was noncompliant with her medication and felt depressed.  [Id.]  Plaintiff saw Dr. Guntupalli twice in 2011.  [AR at 627.]  In June 2011, plaintiff's mood was less depressed and she had stopped taking Wellbutrin.  [Id.] Plaintiff did not show up for her appointment on September 12, 2011.  [Id.]  On October 18, 2011, plaintiff reported she was doing "okay" except for isolating herself.  [Id.]  Dr. Guntupalli noted that plaintiff was fearful of forgetting things, depressed over family problems, and that her sleep and appetite were fair.  [Id.]  The last entry in Dr. Guntupalli's records from January 27, 2012, indicates that plaintiff again failed to attend her scheduled appointment.  [Id.]

With respect to plaintiff's mental health impairments, the ALJ accorded "great weight" to the opinions of the mental health expert, Betty Borden, Ph.D., who opined that plaintiff would be limited to simple repetitive work with no contact with the public and limited contact with supervisors and coworkers,  and the consultative examiner, Steven Brawer, Ph.D, who found, among other things, that plaintiff would be able to perform simple, repetitive tasks.  [AR at 94-95.]  The ALJ did not, as plaintiff argues, disregard Dr. Guntupalli's records.  [JS at 16.]  Rather, the ALJ discussed Dr. Guntupalli's January 2007 findings and treatment records, finding them to support the ALJ's determination that plaintiff can perform light exertional and simple work, while having no public contact, and only occasional contact with peers and supervisors.  [AR at 95-96, 431-32.]  As previously discussed, Dr. Guntupalli assigned plaintiff a GAF score of 60, which indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.[12]  See

---

[12]    The Court notes that plaintiff's GAF score is on the borderline of the "mild" range.  A GAF score of 61 is indicative of **"[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning** . . . , **but generally functioning pretty well, has some meaningful**
(continued...)

1   DSM-IV 34.  His treatment records show plaintiff's "ups" and "downs," but no hospitalizations or
2   more than moderate symptoms.  [AR at 427-32, 492-93, 622-28.]

3       The Court concludes that considering the record as a whole, and because the RFC
4   provides for simple work with no public contact and only occasional contact with peers and
5   supervisors, the ALJ did not err in his evaluation of Dr. Guntupalli's treatment records.

6
7       **4.    Conclusion**

8       Based on the foregoing, the Court concludes that the ALJ's failure to provide specific and
9   legitimate reasons supported by substantial evidence of record in discounting Dr. Metyas' opinion
10  that plaintiff was unable to do her past work was harmless, and that the ALJ did not err in his
11  evaluation of Dr. Guntupalli's treatment records.   However, to the extent that the ALJ's
12  reconsideration of plaintiff's credibility on remand could lead to a different evaluation of these
13  records, Dr. Metyas' and Dr. Guntupalli's treatment records and findings should also be
14  reconsidered on remand.

15
16  **B.    CREDIBILITY**

17      Plaintiff contends the ALJ failed to articulate legally sufficient reasons for rejecting plaintiff's
18  subjective symptom testimony.  [JS at 27-41, 46-50.]

19      "To determine whether a claimant's testimony regarding subjective pain or symptoms is
20  credible, an ALJ must engage in a two-step analysis."  Lingenfelter v. Astrue, 504 F.3d 1028,
21  1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented
22  objective medical evidence of an underlying impairment 'which could reasonably be expected to
23  produce the pain or other symptoms alleged.'"  Id.  at 1036 (quoting Bunnell v. Sullivan, 947 F.2d
24  341, 344 (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may
25  reject the claimant's testimony about the severity of his symptoms "only upon (1) finding evidence

26  _____

27      [12](...continued)
28  **interpersonal relationships.**"  DSM-IV 34.

1  of malingering, or (2) expressing clear and convincing reasons for doing so." Benton v. Barnhart,

2  331 F.3d 1030, 1040 (9th Cir. 2003).  Factors to be considered in weighing a claimant's credibility

3  include:  (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's

4  testimony or between the claimant's testimony and her conduct; (3) the claimant's daily activities;

5  (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the

6  nature, severity, and effect of the symptoms of which the claimant complains.  See Thomas v.

7  Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also Ghanim, 763 F.3d at 1163; 20 C.F.R. §§

8  404.1529(c), 416.929(c).

9      Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ

10  did not find "affirmative evidence" of malingering[13] [see generally AR at 96-98], the ALJ's reasons

11  for rejecting a claimant's credibility must be specific, clear and convincing.  Burrell v. Colvin, 775

12  F.3d 1133, 1140 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)).

13  "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify

14  what testimony is not credible and what evidence undermines the claimant's complaints."  Id. at

15  1138 (quoting Lester, 81 F.3d at 834) (internal quotation marks omitted).  The ALJ's findings "must

16  be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's

17  testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding

18  pain."  Bunnell, 947 F.2d at 345-46 (citation and internal quotation marks omitted).  A "reviewing

19  court should not be forced to speculate as to the grounds for an adjudicator's rejection of a

20  claimant's allegations of disabling pain."  Id. at 346.  As such, an "implicit" finding that a plaintiff's

21  testimony is not credible is insufficient.  Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per

22  curiam).

23      With respect to her daily activities, plaintiff testified at the hearing and in her completed

24  Function Report to the following:  she lives with her husband and two teenage sons; she can walk

25  about fifteen to twenty minutes; she sometimes feels like she needs a cane or other assistive

26

27      [13]   The ALJ did note that plaintiff, "[a]lthough not clearly malingering, was described by a

28  consultative examiner as exhibiting a poor motivation level."  [AR at 97.]

device, but does not use one; she can stand for ten minutes; she can sit for less than an hour; she can lift "maybe two pounds"; her hands "will give out" if she tries to lift a gallon of milk [AR at 12, 25]; she is home alone during the day [AR at 27]; she tries to clean up the kitchen, but it takes a long time because she has to stop to rest or sit down for about half an hour [AR at 27-28]; if she tries to cook dinner, she has to have someone lift the pots [AR at 28]; doing the laundry is "really hard" because she has a hard time bending to get the clothes in and out of the washer and dryer [id.]; she cannot clean her whole house in one day like she used to because she has to do everything "a little bit at a time" [id.]; she tries to get something done every day [id.]; she experiences fatigue and intense pain [AR at 28, 244]; she used to be active in volunteering, but she now "barely go[es] to a meeting every once in a while" when her husband can go [AR at 29]; she cannot stand to get on the freeway anymore, and just drives within three or four miles of her house [id.]; she can still crochet, but must "put it down" after about thirty minutes [id.]; she has to read things over and over because her focus and concentration "falls off" [AR at 30]; and she used to read a 300-page novel in "like a few days and now it takes me like weeks, months." [Id.; see also AR at 97.]

Finding plaintiff's complaints to be "less than fully credible," the ALJ concluded that plaintiff had presented medically determinable impairments that could reasonably be expected to cause the alleged symptoms, but that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's RFC determination]." [AR at 96-97.]  The ALJ stated the following reasons for this determination:  (1) plaintiff's activities of daily living are not consistent with the alleged degree of impairment; (2) plaintiff did not show difficulties in focus or concentration at the hearing; (3) the objective medical evidence does not support plaintiff's allegations; (4) plaintiff "has had a largely conservative history of treatment"; (5) plaintiff "has been described as exhibiting a poor motivation level"; and (6) plaintiff has not complied with prescribed treatment.

Having carefully reviewed the record, the Court concludes that the ALJ's credibility determination is not supported by substantial evidence.

### 1.    Plaintiff's Daily Activities

The ALJ found that plaintiff's activities of daily living are not consistent with the alleged degree of impairment.  [AR at 98.]  The ALJ stated that "there is no evidence that [plaintiff] has any difficulties in performing her daily activities," and noted that plaintiff's activities "tend to show" that she has the ability to perform work because she "tak[es] her sons to school and pick[s] them up, volunteer[s] at her son's [sic] school, run[s] errands, cook[s] simple meals, do[es] laundry, clean[s] the kitchen, and go[es] shopping with accompaniment"; "watches television, uses the computer, and does crossword puzzles"; "visit[s] with friends or family once in awhile [sic], and . . . has friends who call her once in awhile [sic]"; and  "takes short walks."  [AR at 97-98.]  The ALJ concluded that plaintiff's activities "suggest that [plaintiff] has a better capacity than she has stated in the written statements."  [Id.]

An ALJ may discredit testimony when plaintiff reports participation in everyday activities indicating capacities that are transferable to a work setting.  Molina, 674 F.3d at 1113.  However, "[e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting [plaintiff]'s testimony to the extent that they contradict claims of a totally debilitating impairment."  Id. (citing Turner, 613 F.3d at 1225); Valentine, 574 F.3d at 693.

Here, other than his conclusory statement that plaintiff's activities "tend to show that [plaintiff] does have the ability to perform work," the ALJ fails to provide any analysis as to how this is so.  An ALJ must identify "which daily activities conflicted with which part of [c]laimant's testimony," pointing to specific facts in the record to support an adverse credibility finding.  Burrell, 775 F.3d at 1138.  To the extent that the ALJ relies upon plaintiff's short walks, this activity was prescribed as part of plaintiff's treatment plan.  [See, e.g., AR at 98, 616, 930.]  The ALJ noted that plaintiff engages in various activities, such as doing laundry, cleaning the kitchen, going shopping with accompaniment, cooking simple meals, running short errands, and volunteering at school.  [AR at 27-28, 98, 233-34, 243-49, 909.]  However, the amount of involvement plaintiff described in each of these activities was minimal, and the ALJ does not explain how this level of activity describes a person engaged in even basic work activity.  [AR at 27-28, 233-34, 243-49, 909.]  The

ALJ also noted that plaintiff spends her free time watching TV and visiting with friends or family "once in a while," but also reported to Dr. Brawer that she spends most of her time in bed.  [AR at 98, 909.]  Again, the ALJ failed to explain how these activities describe an individual who engages in a "normal" level of daily activity or whose activities "replicate" those required for maintaining employment.

Accordingly, this was not a specific, clear and convincing reason for discounting plaintiff's credibility.

### 2.     Conduct at the Hearing

Plaintiff testified that she has to read things over and over because her focus and concentration "falls off."  [AR at 30.]  She indicated in a Fatigue Questionnaire that she loses her train of thought and has to have things repeated to her when she is talking to someone.  [AR at 97, 234.]  She indicated in a Function Report that she can pay attention for about fifteen minutes and can follow spoken instructions after they are repeated several times.  [AR at 97, 248.]  These complaints were corroborated by the April 1, 2012, finding of the psychiatric consultative examiner, Kamal Dhawan, M.D., who noted that when he started asking questions about memory and concentration, plaintiff "was feeling somewhat confused."  [AR at 901.]  He also stated that "in general, [plaintiff] had a hard time concentrating," and "[o]nly when [he] asked specific questions would she try hard to focus and would take a lot of time to answer the questions."[14]  [Id.]

The ALJ noted that plaintiff did not show any difficulty in focusing or concentrating when "providing answers to questions or in volunteering information, *at the hearing*."  [AR at 97 (emphasis added).]  However, the ALJ does not indicate whether he was referring to the 2012 hearing, or the 2010 hearing, although it would seem logical to infer that he was referring only to the more recent hearing.  At the 2012 hearing, which went on for just under half an hour, plaintiff answered questions, and "volunteered" information three times: she stated her name when asked; when the ALJ stated that plaintiff had been a demonstrator, plaintiff spontaneously asked, "A

---

[14]   Dr. Dhawan's opinion is discussed in more detail infra, section V(B)(3)(c).

demonstrator?"; and when asked by counsel whether plaintiff had been a food demonstrator, plaintiff responded, "No." [AR at 993-94.] That was the extent of plaintiff's contribution to the 2012 hearing.  The September 2010 hearing, held almost two years before the 2012 decision was issued, lasted approximately an hour. [AR at 11-54.]  Although plaintiff's testimony at this hearing was more extensive, it is impossible to glean from the cold transcript whether plaintiff had any difficulty in focusing or concentrating, and the ALJ failed to provide any specifics as to his observations.  Indeed, there were a few instances where plaintiff was unable to remember names of doctors she had seen and the dates she had seen them.  [See, e.g., AR at 21-22, 26.]  Plaintiff's testimony took up only a small portion of the entire transcript, and consisted generally of her responding to focused questions from the ALJ or counsel. [AR at 12-31.]  Therefore, she was not required to read things, engage in an extended discussion, or follow instructions -- things that she testified she had difficulty with -- and her ability to respond at the hearing is consistent with Dr. Dhawan's finding that plaintiff would try hard to focus when she was asked specific questions.  The Court also finds it significant that in his 2010 decision the ALJ did not include any observation regarding plaintiff's ability to focus and concentrate at that hearing as a factor for discrediting her subjective symptom testimony.  [See generally AR at 62-71.]

Although they may not form the sole basis for discrediting a claimant, an ALJ may properly consider his own observations at the hearing as part of the credibility analysis.  Orn, 495 F.3d at 639-40 (ALJ's personal observations may be used in "the overall evaluation of the credibility of the individual's statements," but may not form the sole basis for discrediting that testimony) (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 n.1 (9th Cir. 1985) ("The ALJ's observation of [the claimant]'s demeanor was relevant to his credibility and was not offered or taken as a substitute for medical diagnosis.")  Based on the circumstances herein as discussed above, and regardless of whether the ALJ was referring to plaintiff's 2012 or 2010 hearing testimony, the Court concludes that this was not is a specific, clear and convincing reason to discount plaintiff's credibility.

/

### 3.      Objective Evidence of Record

The ALJ also found that the objective evidence does not support plaintiff's subjective symptom allegations. [AR at 97.] Specifically, he stated that "there is simply not enough evidence of debilitating impairments to make [plaintiff's] allegations [of functional limitations, depression, anxiety, fatigue, medication side effects, inability to focus and concentrate, inability to be around other people, and pain] readily believable." [AR at 97; see also AR at 96.] Plaintiff argues that her migraine headaches are documented in the records and must be considered, and that the record is "replete with objective evidence supporting [her] [r]heumatoid arthritis, [f]ibromyalgia, and [a]nxiety." [JS at 40.]   However, the ALJ found plaintiff has the severe impairments of fibromyalgia, anxiety, and rheumatoid arthritis [AR at 88] and the issue, therefore, is whether plaintiff's testimony regarding the subjective symptoms associated with these impairments was credible.

While a lack of objective medical evidence supporting a plaintiff's subjective complaints cannot provide the only basis to reject a claimant's credibility (see Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)), it is one factor that an ALJ can consider in evaluating symptom testimony.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor the ALJ can consider in his credibility analysis."); accord Rollins, 261 F.3d at 857.

### a.      Migraine Headaches

Contrary to plaintiff's argument that the ALJ should have considered her migraine headaches [JS at 40], the ALJ found that plaintiff experiences migraine headaches, but also found this was not a severe impairment because the headaches did not cause a significant limitation in her ability to perform basic work activities.  [AR at 89.]  The ALJ noted that plaintiff had a negative head CT scan in August 2009 [AR at 89, 592], and that he found no evidence suggesting that plaintiff's migraines were uncontrolled or had any effect on her functioning.  [AR at 89, 592.]  On January 16, 2007, during her intake evaluation with Dr. Guntupalli, plaintiff reported migraine

1  headaches in her background, but her presenting complaints were related to panic attacks.  [AR

2  at 431.]  However, on June 13, 2008, plaintiff complained to John Koumas, D.O., of a severe

3  headache.  [AR at 607.]  Dr. Koumas assessed "[c]lassical migraine."  [AR at 608.]  Dr. Koumas

4  told plaintiff to try Tramadol (Ultram), as needed.  [Id.]  For some time, plaintiff did not complain

5  about migraines to Dr. Koumas.  [AR at 648-51.]  On December 8, 2009, Dr. Metyas indicated that

6  plaintiff's migraines had "started again," and prescribed Tramadol[15] as needed.  [AR at 792, 794-

7  95.]  On January 18, 2011, Dr. Koumas assessed "[c]ommon migraine without mention of

8  intractable mig," and noted "sub-optimal control."  [AR at 645.]

9       Accordingly, the Court concludes that the ALJ's finding that there was no evidence that

10  plaintiff's migraine headaches were uncontrolled, is not supported by the evidence.

11

12              **b.    Fibromyalgia**

13       Regarding the ALJ's consideration of her fibromyalgia, plaintiff argues that "the only

14  objective evidence [of that condition] is the pressure pain points."  [JS at 40.]  In the decision, the

15  ALJ noted two records showing 0/18 tender points[16] and a normal neurological examination in July

16  2008 and January 2011 [AR at 93, 402, 776], two records reflecting 10/18 tender points and a

17  normal neurological examination in January and March 2009 [AR at 93, 470, 474], one record

18  reflecting 13/18 tender points and a normal neurological examination in June 2009 [AR at 93, 567],

19  and one record reflecting 11/18 tender points and a normal neurological examination in March

20  2010.[17]  [AR at 93, 956.]  The ALJ also noted that on two dates, May 2010 and November 2011,

21

22       [15]  As discussed in more detail in relation to plaintiff's medication side effects, it is not always clear
why Dr. Metyas adjusted plaintiff's medications.  [See infra Part V(B)(3)(e).]  Indeed, at the same visit

23  when she complained to him of her migraines starting again, she also complained of radiating chest
pain to her back, among other things, and there is no indication as to the complaint for which Dr.

24  Metyas decided to prescribe the medication.  [AR at 794.]

25       [16]  "Tender points," the term used in Dr. Metyas' treatment records in assessing plaintiff's

26  fibromyalgia, appears to have the same meaning as "trigger points."

27       [17]  As previously discussed (see supra note 10), to get a medical diagnosis of fibromyalgia,
at least eleven of the eighteen "trigger" or "tender" point sites must be painful when pressed.

28                                                                                    (continued...)

plaintiff had 18/18 tender points, but had normal neurological examinations on those dates; and on a third date in March 2012, Dr. Metyas found 18/18 tender points, yet reported that plaintiff had a normal musculoskeletal system, intact sensation, normal motor strength, normal fine motor movements, and an overall normal examination.  [AR at 93, 779, 929-30, 954.]  The ALJ concluded that these findings "are consistent with [plaintiff] performing light exertional work."  [AR at 93.]

An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster his findings.  See, e.g., Holohan, 246 F.3d at 1207-08 (holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others).  As the Ninth Circuit recently explained, "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."  Garrison, 759 F.3d 995, 1017 (citing Holohan, 246 F.3d at 1205.

Here, as discussed above, the ALJ referenced only nine of Dr. Metyas' treatment records between December 5, 2007, and March 8, 2012.  [AR at 93.]  After its review of the record, the Court finds that the ALJ appears to have improperly selectively referred to plaintiff's treatment records:  indeed, a total of fifteen of Dr. Metyas' approximately twenty-six treatment records between December 2007 and March 2012 assessed plaintiff with 18/18 tender points [see AR at 770, 776, 778, 788, 792, 794, 796, 800, 814, 816, 822, 824, 826, 830, 930]; two of the twenty-six records indicate 13/18 tender points [see AR at 567, 802]; one of the twenty-six records indicates 11/18 tender points [see AR at 790], and three of the twenty-six records indicate 10/18 tender points.  [AR at 804, 806, 809.]  Of the remaining five records, two fail to provide an assessment of the number of tender points, although one states plaintiff had pain in her neck and hips [AR at 778], and the other states that she has pain "all over" at the level of 6-7 on a scale of 10 [AR at

784]; two indicate 0/18 tender points, but one of these, a July 2008 record referenced by the ALJ [AR at 93], also indicated that plaintiff's hands hurt on the inside, and that her joints "froze" [AR at 820], and the other, not referenced by the ALJ, indicated that plaintiff experienced pain in her chest, and "pain all the time," and concluded that her fibromyalgia was active and severe.  [AR at 798.]  The final record of the twenty-six, which indicates 0/18 tender points as noted by the ALJ [AR at 93, 776], is dated *on the same date* that another of Dr. Metyas' treatment records found 18/18 tender points, and noted new pain in the right foot and that plaintiff "can't walk on foot because of pain," that the "pain [is] still there," and "hurts so bad nothing to help it."  [Compare AR at 776 with AR at 778.]  There is no indication why there should be such different findings on the same date, although one note seems to focus on plaintiff's chief complaint of weight and hot flashes [AR at 776], and the other on the fact that her "joint pain is there," and reviews a recent MRI and bone density test.  [AR at 778.]   Additionally, at numerous examinations, plaintiff's fibromyalgia was noted to be active and/or severe [see, e.g., AR at 567-68, 580-81, 614, 668, 771, 793, 801, 803, 805, 827, 831], and the record is generally replete with plaintiff's complaints of pain. [See, e.g., AR at 770, 774, 778, 784 (indicating "Pain sever[e], Can't live normal life," and "Pain all over"); 786, 788, 790, 792, 796, 798 ("Pain all time"); 800, 802 ("hands hurt[] a lot; . . . compression gloves . . . helped"); 804, 806, 808, 814 ("hand pain, pain all over"); 820 ("hands hurt[] on inside - difficult to turn a towel, . . . all joint[s] froze, couldn't sit too long; joints lock up on her"); 822, 824, 830.]

        Based on the ALJ's selective review of the evidence regarding plaintiff's fibromyalgia, and because fibromyalgia is diagnosed on the basis of reports of pain and other symptoms, not by an objective test, the Court finds that substantial evidence does not support the ALJ's finding that the objective evidence regarding plaintiff's fibromyalgia does not support her subjective complaints of pain and other symptoms and limitations associated with that condition.  See Benecke, 379 F.3d at 590, 594 n.4.

/

/

### c.      Anxiety

The ALJ noted that the Appeals Council order specifically called for consideration of plaintiff's anxiety.  [AR at 78-80, 88.]  The ALJ stated that he found "little evidence supporting a diagnosis of anxiety," but nevertheless included this impairment among plaintiff's severe mental impairments.  [AR at 88.]  The ALJ "d[id] not find that [plaintiff]'s anxiety cause[d] her limitations beyond those specified in the [RFC]".  [Id.]

Dr. Guntupalli diagnosed panic disorder during the intake evaluation in January 2007, and assigned a GAF score of 60, indicating moderate symptoms or moderate difficulty in social or work situations.  DSM-IV 34.  [AR at 431-32.]  Dr. Guntupalli's treatment records indicate complaints of anxiety and depression, and treatment with medication.  [AR at 622-28.]  Plaintiff testified that Cymbalta and Xanax "somewhat" help her depression and anxiety.  [AR at 27.]

Dr. Borden, a mental health expert, testified at the hearing on May 16, 2012.  [AR at 985.]  Dr. Borden opined that plaintiff has "anxiety problems" and depression, which have been diagnosed as panic disorder and depressive disorder not otherwise specified.  [AR at 988.]  Dr. Borden testified that plaintiff would be limited to simple repetitive work with no contact with the public and limited contact with supervisors and coworkers.  [AR at 989-90.]  The ALJ gave Dr. Borden's opinion "great weight," because she had the opportunity to review the entire record, and had a complete picture of plaintiff's medical history and treatment."  [AR at 94.]

Dr. Brawer conducted a psychological evaluation of plaintiff on April 6, 2012.  [AR at 94-95, 907-14.]  Dr. Brawer found that plaintiff "presents with depressive/anxiety symptoms and somatic complaints, which may result in mild to moderate limitations in ability to manage customary work stress and persist for a regular workday."  [AR at 95, 914.]  Based on test results and behavioral presentation, Dr. Brawer found that plaintiff would be able to learn simple, repetitive tasks, and may be able to perform some detailed, varied, or complex tasks [AR at 97, 914]; her ability to sustain attention and concentration for extended periods of time was mildly diminished [AR at 97, 914]; and she could work independently and could sustain a cooperative relationship with co-workers and supervisors.  [AR at 914.]  Dr. Brawer questioned plaintiff's motivational level and

noted that "the present findings may be a somewhat low estimate of [plaintiff]'s current level of functioning." [AR at 98, 911.]  Dr. Brawer diagnosed depressive disorder, secondary to general medical condition. [AR at 913.] The ALJ gave Dr. Brawer's opinion "great weight," as it "is largely consistent with Dr. Borden's opinion and the record as a whole." [AR at 94.]

Dr. Dhawan conducted a psychiatric evaluation of plaintiff on April 1, 2012. [AR at 95, 897-905.]  Dr. Dhawan found plaintiff coherent and organized, with no tangentiality or loosening of associations. [AR at 96, 899.]  Plaintiff's thought content was relevant and non-delusional. [AR at 96, 900.]  Her mood was described as tired and anxious, and her affect was mood congruent and somewhat confused. [Id.]  Plaintiff could perform serial threes and do simple calculations. [Id.]  She was able to follow the conversation well. [AR at 96, 900.]  Her insight and judgment were intact. [AR at 96, 901.]  Dr. Dhawan diagnosed panic disorder with agoraphobia and depression, not otherwise specified. [AR at 96, 901.] Dr. Dhawan concluded that plaintiff had mild limitations in understanding, remembering, and carrying out simple one- or two-step job instructions [AR at 96, 901]; moderate limitations in her ability to do detailed and complex instructions,[18] maintaining concentration, attention, persistence, and pace, associating with day-to-day work activity, accepting instructions from supervisors, and maintaining regular attendance in the work place and performing work activities on a consistent basis. [AR at 96, 901-02.]  Dr. Dhawan also determined that plaintiff had severe limitations in relating and interacting with co-workers and the public, and performing work activities without special or additional supervision. [AR at 96, 902.]

The ALJ gave Dr. Dhawan's opinion only "some weight" as it included limitations that were not consistent with the record as a whole, he did not perform any objective tests, and his findings were not consistent with his opinion. [AR at 95-96.]  Plaintiff does not argue that the ALJ improperly discounted Dr. Dhawan's opinion. [JS at 37-39.]  Nevertheless, the Court finds that

---

[18]   Interestingly, in a Medical Source Statement of Ability to do Work-Related Activities (Mental) that he completed on the same date as his report, Dr. Dhawan indicated plaintiff had *marked* difficulty in carrying out complex instructions, and making judgments on complex work-related decisions. [AR at 903.] He also noted marked limitations in plaintiff's ability to respond appropriately to "usual work situations and to changes in a routine work setting." [AR at 904.]

Dr. Dhawan's opinion was inconsistent with Dr. Guntupalli's intake evaluation and subsequent treatment, and with Dr. Brawer's opinion.  [AR at 431-32, 622-28, 907-14.]  Dr. Dhawan conducted a mental status examination [AR at 897-902], but did not conduct any other diagnostic testing, in contrast to Dr. Brawer who administered the Wechsler Adult Intelligence Scale, Wechsler Memory Scale, and the Bender Gestalt Visual Motor Test.  [AR at 907.]  Additionally, Dr. Dhawan's opinion that plaintiff had severe limitations in relating and interacting with others, and performing activities without special or additional supervision, is unsupported by his findings.  [AR at 897-902.]

The ALJ noted that the opinion and findings of Dr. To (a physical consultative examiner who also found that plaintiff had an average memory, full orientation, and was able to establish a good rapport with Dr. To), the opinion of Dr. Borden, the opinion and findings of Dr. Brawer, the findings of Dr. Dhawan, and plaintiff's treatment records "are all consistent with [plaintiff] performing light exertional and simple work, while having no public contact and occasional contact with peers and supervisors."  [AR at 96.]

Based on the foregoing, the Court concludes that the ALJ's finding that the objective evidence does not support plaintiff's subjective complaints regarding disabling anxiety, is supported by substantial evidence.

### d.    Rheumatoid Arthritis

Regarding rheumatoid arthritis, the ALJ noted that plaintiff had an elevated rheumatoid factor based on laboratory tests in December 2008.  [AR at 93, 734.]  The ALJ noted that in January 2009, plaintiff had minimal right and left knee osteoarthritis based on diagnostic imaging. [AR at 93, 435-36.]  In January 2011, plaintiff's rheumatoid arthritis was noted to be in remission and doing well.  [AR at 779.]

Based on the foregoing, the Court concludes that the ALJ's finding that the objective evidence does not support plaintiff's subjective complaints, at least insofar as they were based, if at all, on her rheumatoid arthritis, is supported by substantial evidence.

/

### e.    Medication Side Effects

Plaintiff generally cites to a "List of medications for Gwendolyn Hicks," submitted to the agency on September 1, 2010, as showing the side effects she experienced from her medications.[19]  [JS at 17-18 (citing AR at 326), 626.]  Plaintiff's husband testified that Dr. Metyas would change plaintiff's medications when "immunity would kick in."  [AR at 46.]  The ALJ stated that despite plaintiff's allegations of fatigue and medication side effects, the record does not show that plaintiff's doctors adjusted her medication in response to such complaints or due to any mental limitations caused by her medication.  [AR at 97.]

A review of the record shows that Dr. Metyas adjusted plaintiff's medication periodically, although the reasons for doing so are not always entirely clear.  [See, e.g., AR at 588, 590, 787, 795, 799, 805, 815, 824, 826.]  For instance, on September 29, 2009, plaintiff complained that she was experiencing fatigue, had pain "all over the body," and her muscles hurt.  [AR at 587.]  Dr. Metyas noted, "Gabapentin; Lyrica not good," and "stop Plaquenil."  [AR at 587.]  Plaintiff's list does not allege any side effects from Gabapentin, Lyrica or Plaquenil.  [AR at 326.]  Plaintiff also complained of gaining weight on Lyrica and feeling "drugged" on Cymbalta.  [AR at 398.]  However, plaintiff continued taking Cymbalta and, in May 2009, indicated that she felt Cymbalta was helping.  [AR at 624; but see AR at 942 (indicating on January 5, 2011, that  plaintiff was not taking Cymbalta, but instead was taking Abilify, and complained of getting a little dizzy).[20]]  Plaintiff testified in September 2010 that Cymbalta and Xanax made her drowsy and tired, but helped her depression and anxiety.  [AR at 27.]  Plaintiff was still taking Cymbalta as of October 2011.  [AR at 627.]  Dr. Metyas also indicated that he "[s]topped Ultram [due to] dry mouth, [no] appetite."

---

[19]    It is not clear from the list itself whether the list was intended to present a general list of side effects, or only to reflect the side effects plaintiff believed she was experiencing as a result of the medications.  [AR at 326.]  In the JS, however, plaintiff portrays this document as reflecting the side effects she was actually experiencing.  [See, e.g., JS at 17-18 (stating for several of the listed medications that "Claimant's side effects include . . . .").]

[20]    This document is the same anomalous document, dated January 5, 2011, that reflects 0/18 tender points as discussed supra for which another record with that same date reflects 18/18 tender points; in addition to Abilify, it indicates plaintiff is taking Wellbutrin, which also is not reflected on the other note of the same date.  [Compare AR at 776 with AR at 778.]

[AR at 470.]

In contrast, Dr. Guntupalli's treatment records repeatedly indicate "[n]o side effects noted." [AR at 428-30, 622, 624.] Medication was periodically changed, but there is no indication that the changes were due to complaints of medication side effects of fatigue or mental limitations. [AR at 429, 585-89, 622-24.] For example, in June 2008, Dr. Guntupalli wrote: "Reports that she has been feeling more anxious recently. Stopped Prozac and taking Xanax. Rheumatologist placed her on Cymbalta. Started to exercise. Coping skills are poor. Her sleep and appetite are improving. Supportive treatment provided. Plan to restart Prozac . . . ." [AR at 625.] In June 2011, Dr. Guntupalli wrote: "Doing a little better. Stopped Wellbutrin. Mood is less depressed. Has financial problems. Sleep and appetite are fair. Supportive treatment provided . . . ." [AR at 627.]

Based on the foregoing, the Court concludes that the ALJ's finding that the record fails to demonstrate that plaintiff's doctors adjusted her medication in response to complaints of medication side effects is supported by substantial evidence.

### f.    Conclusion

The ALJ's determination that there was not enough objective medical evidence to make plaintiff's subjective complaints "readily believable," was supported only in part, i.e., as to plaintiff's rheumatoid arthritis, medication side effects, and anxiety, but not as to plaintiff's allegations relating to her fibromyalgia or migraine headaches. However, even for those issues for which there was record support, as a whole this was not a convincing reason to find plaintiff not "readily believable." For instance, the fact that plaintiff's rheumatoid arthritis had diminished, or that her doctors did not provide explanations for their reasons for adjusting plaintiff's medications, does not significantly impact on plaintiff's credibility. Additionally, although the ALJ found that plaintiff's anxiety was not as disabling as she alleged, he nevertheless found, based on the reports of Dr. To, Dr. Borden, Dr. Brawer, Dr. Dhawan, and plaintiff's treatment records, that it was severe enough to restrict her to no public contact and only occasional contact with peers and supervisors.

1   Thus, overall, the ALJ's determination that the objective medical evidence did not support plaintiff's

2   subjective symptom allegations was not specific, clear and convincing, and supported by

3   substantial evidence.

4

5        **4.    Conservative Treatment**

6        The ALJ stated that plaintiff "has had a largely conservative history of treatment for her

7   impairments." [AR at 97.]  According to the ALJ, "the conservative nature of [plaintiff]'s treatment

8   history suggests that she is not as limited as she alleges." [Id.]

9        An ALJ may properly rely on the fact that only routine and conservative treatment has been

10  prescribed. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). "Conservative treatment" has

11  been characterized by the Ninth Circuit as, for example, "treat[ment] with an *over-the-counter pain*

12  *medication*" (see, e.g., Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007)) (emphasis added).

13  Here, Dr. Guntupalli treated plaintiff with prescription medications and supportive treatment.  [AR

14  at 427-32, 492-93, 622-28.]   Dr. Metyas also treated plaintiff with a variety of prescription

15  medications and recommended exercise, physical therapy, and water therapy.  [AR at 23, 397-

16  426, 470-90, 554-97, 659-891, 928-32.]  Plaintiff testified that she had not had physical therapy

17  because her insurance would not cover it.  [AR at 23.]  She testified that she tries to go to water

18  therapy when she can, which is not very often.  [Id.]

19       The ALJ failed to articulate what, if any, other treatment was available for plaintiff's physical

20  and mental impairments.   Although he noted that plaintiff had not undergone any surgical

21  procedures or pain relief injections, there is no evidence in the record that surgery or injections

22  had been recommended for plaintiff or would have been a viable treatment option.  The ALJ also

23  noted that with respect to plaintiff's mental health, plaintiff responded well to prescribed

24  medications and reported that she felt "a little better" in July 2009, March 2011, and June 2011.[21]

25  [AR at 97, 624, 627-28.]  However, the record also shows that plaintiff had increased anxiety in

26  _____

27       [21]   Although the ALJ also commented that there was no evidence of mental health treatment in
    2012 [AR at 97], the records also show that plaintiff was still taking Cymbalta in 2012.  [See, e.g., AR
28  at 898.]

June and August 2008, had a panic attack in September 2009, felt depressed in November 2010 and February 2011, had anxiety in April 2011, and isolated herself in October 2011. [AR at 622-28.] Thus, it is not entirely clear that plaintiff's allegedly "conservative" treatment was necessarily controlling her mental health symptoms.

As the Ninth Circuit recently explained, "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." Garrison, 759 F.3d 995, 1017 (citing Holohan, 246 F.3d at 1205; see also Scott v. Astrue, 647 F.3d 734, 739-40 (7th Cir. 2011) (citations omitted) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce, and that difference is borne out in Dr. Tate's treatment notes. Those notes show that although Scott had improved with treatment, she nevertheless continued to frequently experience bouts of crying and feelings of paranoia. The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits."). Thus, "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms." Garrison, 759 F.3d at 1017 (citing Ryan, 528 F.3d at 1200-01)); see also Holohan, 246 F.3d at 1205 ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."). Here, the ALJ improperly relied on three treatment records among many which reported plaintiff felt "a little better."

Based on the foregoing, the Court concludes that,  plaintiff's allegedly "conservative" treatment for her physical complaints, and to which she "responded well" with respect to her mental health treatment, was not a specific, clear and convincing reason to discount plaintiff's credibility.

/

### 5.    Poor Motivation

The ALJ stated that plaintiff's "[e]fforts to impede accurate testing and evaluation support a finding of poor credibility." [AR at 97.]  The ALJ noted that Dr. Brawer observed that plaintiff complained that the Bender-Gestalt Visual Motor Test was "way too hard" and she did not correct obvious mistakes in her drawings on the test, even after she had noted them. [AR at 97-98, 907.] Dr. Brawer also questioned plaintiff's motivation level. [AR at 98, 907, 911.]  An ALJ may use "ordinary techniques of credibility evaluation" (Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996)) and may "draw inferences logically flowing from the evidence."  Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996) (citation and internal quotations omitted).  Evidence of lack of motivation is a valid reason to discount a claimant's credibility.  See Osenbrock v. Apfel, 240 F.3d 1157, 1166 (9th Cir. 2001).  The Court notes, however, that Dr. Brawer made the only reference to "questionable" motivation in an otherwise voluminous treatment record, and even then, his reference was equivocal.  [AR at 907 (stating that plaintiff's "motivation level appeared questionable *at times.*") (emphasis added).]

Based on the foregoing, the Court concludes that, overall, plaintiff's allegedly "questionable" motivation was not a clear and convincing reason to discount plaintiff's credibility.


### 6.    Noncompliance with Treatment

The ALJ further discounted plaintiff's credibility in stating that "the record contains substantial evidence that [plaintiff] has failed to comply with prescribed treatment." [AR at 98.] The ALJ noted that plaintiff had multiple no shows for mental health appointments between 2007 and 2012, and that Dr. Guntupalli had noted that plaintiff was noncompliant with her treatment in November 2010.  [AR at 98, 428-32, 622-28.]  The ALJ concluded that plaintiff's "inconsistent compliance with treatment suggests that [ ] her symptoms are not as disabling as she alleges." [AR at 98.]

An ALJ may consider an "unexplained or inadequately explained" failure to follow a prescribed course of treatment.  See Molina, 674 F.3d at 1112; see also id. at 1113-14

("[Plaintiff]'s failure to assert a good reason for not seeking treatment, or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of [plaintiff]'s . . . testimony.").

Here, the ALJ cited one instance out of a lengthy treatment record that plaintiff was noted to be noncompliant with her medication.  [AR at 624.]  This one instance of noncompliance does not display a pattern or the "type of apathy that would suggest that plaintiff's symptoms are not as serious as alleged."  Hernandez v. Colvin, 2013 WL 655261, at *5 (C.D. Cal. Feb. 22, 2013).  Plaintiff failed to keep appointments approximately eight times between 2007 and 2012.  [AR at 428-32, 622-28.]  Overall, however, plaintiff had regular mental health treatment every couple of months since 2007.  [AR at 428-32, 622-28, 989.]  Further, plaintiff had regular treatment with Dr. Metyas since 2007.  [AR at 397-426, 470-90, 554-97, 659-891, 928-32.]  Again, the ALJ is not permitted to selectively rely on only the records that support his position.  Holohan, 246 F.3d at 1207-08

For these reasons, the Court concludes that substantial evidence does not support the ALJ's reliance on noncompliance with treatment as a reason to discredit plaintiff's testimony.

### 7.    Conclusion

In sum, the Court finds that the ALJ's determination to discount plaintiff's credibility based on her activities of daily living, allegedly conservative treatment, "questionable" motivation, behavior at the hearing, lack of objective medical evidence, and noncompliance with treatment was not legally sufficient.

Based on the record as a whole, the Court concludes that the ALJ's credibility determination was not specific, clear and convincing, and supported by substantial evidence.  Remand is warranted on this issue.

### C.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff contends that the ALJ erred in the RFC assessment by failing "to properly consider

the record as a whole and consider the combination of [plaintiff]'s exertional and non-exertional impairments and ability to sustain work activity as required."  [JS at 50-55.]

Pursuant to the Appeals Council remand order, the ALJ further considered plaintiff's RFC. In the vacated 2010 decision, the ALJ found that plaintiff had the RFC to perform light work, except no more than frequent use of the hands, no heights or other hazards, and no more than simple to moderately complex work activities.  [AR at 67.]  In the July 2012 decision, the ALJ found that plaintiff had the RFC to perform light work, except frequent use of the hands, no heights and hazards, simple work, and no public contact or more than occasional contact with peers and supervisors.  [AR at 92.]

Because the case is being remanded for reconsideration of plaintiff's credibility, which may affect the ALJ's findings regarding the functional limitations resulting from plaintiff's impairments, on remand the ALJ shall also reconsider plaintiff's RFC.

## D.    LAY WITNESS STATEMENT

In determining the severity of a claimant's impairments and how the impairments affect her ability to work, lay witness testimony[22] by friends and family members who have the opportunity to observe a claimant on a daily basis "constitutes qualified evidence" that the ALJ must consider. See Sprague v. Bowen, 812 F.2d 1226, 1231-32 (9th Cir. 1987); see also Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006); Smolen, 80 F.3d at 1288; 20 C.F.R. §§ 404.1513(d)(4), (e), 416.913(d)(4), (e).  Such testimony "is of particular value" because those who see a claimant every day can often tell whether she is suffering or merely malingering.  See Smolen, 80 F.3d at 1289 (citing Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)).  While an ALJ is not required "to discuss every witness's testimony on an individualized, witness-by-witness basis" (Molina, 674 F.3d at 1114), he may discount the testimony of lay witnesses only for "reasons that are germane to each witness."  Dodrill, 12 F.3d at 919; Regennitter v. Comm'r of

---

[22] Lay witnesses include spouses, parents and other care givers, siblings, other relatives, friends, neighbors, and clergy.  20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4).

1    Soc. Sec. Admin., 166 F.3d 1294, 1298 (9th Cir. 1999).

2         Here, plaintiff's husband, Harold Hicks, completed a Third Party Function Report and

3    testified at the September 2010 hearing.  [AR at 98, 31-50, 251-59.]  Mr. Hicks testified as follows:

4    plaintiff volunteers for Independent Order of Foresters and she is organizing a member event at

5    the Pomona Fairgrounds [AR at 39]; she does not spend much time on the committee, and she

6    basically fills out applications to request funding and communicates with people via e-mail [AR at

7    41]; a little activity tires plaintiff; plaintiff can walk or stand for an hour, and can focus for an hour

8    [AR at 42]; plaintiff is "in a constant state of pain"; she wakes up depressed and has very restless

9    nights; she drives her younger son to and from school, which is about two miles from their house

10   [AR at 43]; she spends thirty to ninety minutes cooking complete meals two to three days a week,

11   whereas she used to cook about four to five days a week [AR at 45, 259]; she cleans when she

12   can and does laundry over a period of days [AR at 48, 253]; she does water aerobics about two

13   to three times a week [AR at 46]; she takes a lot of naps, and when she is not napping, she is lying

14   down [AR at 49]; she has to read things several times to grasp them, and she has difficulty

15   completing crossword puzzles [AR at 49, 259]; sudden or loud noises make her "[e]xtremely

16   nervous" [id.]; she goes shopping on an as-needed basis and is usually accompanied by someone

17   for moral and emotional support [AR at 254]; and she spends time with others, mostly over the

18   phone, but sometimes at a restaurant.  [AR at 259.]

19        The ALJ concluded that Mr. Hicks' statements "conflict[ ] with and fail[ ] to overcome the

20   probative effect of the medical evidence" because:  (1) Mr. Hicks has a financial interest in the

21   outcome of the case, as he lives with plaintiff as her spouse; and (2) Mr. Hicks' statements show

22   "reasonably normal activities of daily living," such as doing laundry, shopping in stores, and

23   preparing meals.  [AR at 98.]

24        The ALJ's first reason for discounting Mr. Hicks' credibility is improper.  An ALJ may not

25   presume bias on the part of a claimant's family member simply because he or she is related to the

26   claimant.  See Regennitter, 166 F.3d at 1298 (ALJ improperly rejected lay witness testimony of

27   the plaintiff's mother on the basis of presumed bias); see also Smolen, 80 F.3d at 1289 (ALJ's

28

1    rejection of the plaintiff's family members' testimony on the grounds that they were

2    "'understandably advocates, and biased' . . . amounted to a wholesale dismissal of the testimony

3    of all the witnesses as a group and therefore does not qualify as a reason germane to each

4    individual who testified").  Similarly, the rejection of lay witness testimony on the ground that the

5    testifying witness lives with or supports the claimant, and therefore must be biased, is not a reason

6    germane to that witness.  See Johnson v. Astrue, 2008 WL 4553141, at *6 (C.D. Cal. Oct. 9, 2008)

7    ("The ALJ's reasoning that witnesses who live with or support a plaintiff are not credible for

8    reasons of bias cannot be considered legally proper, since the same rationale could be used to

9    reject lay witness testimony in almost every case.").

10         The ALJ also discounted Mr. Hicks' statements because they show reasonably normal

11    activities of daily living.  [AR at 98.]  The ALJ fails to explain how doing laundry over a period of

12    days, shopping with accompaniment for moral and emotional support, and cooking meals two to

13    three days a week, show reasonably normal activities of daily living, particularly in light of Mr.

14    Hicks' other testimony that plaintiff naps a lot, lies down a lot, and used to do a lot more.

15         To the extent the ALJ discounted Mr. Hicks' statements because they were inconsistent

16    with the objective medical evidence, the ALJ did not identify which of Mr. Hicks' statements are

17    unsupported by the medical evidence, or what medical evidence contradicts his statements.  See

18    Bruce, 557 F.3d at 1115 (citing Stout, 454 F.3d at 1054) ("If an ALJ disregards the testimony of

19    a lay witness, the ALJ must provide reasons 'that are germane to each witness . . . [and the

20    reasons] must be specific.").

21         Accordingly, the ALJ failed to give any legally adequate reasons to reject Mr. Hicks' lay

22    witness statements.  The ALJ on remand must reassess the statements of Mr. Hicks.

23

24    **E.**      **HYPOTHETICAL TO THE VE**

25         Plaintiff contends the ALJ's hypothetical questions to the VE did not encompass the nature

26    and extent of her mental impairments and combination of impairments.  [JS at 68-71.]

27         On remand, based on the ALJ's RFC determination to be made consistent with this Order,

28

1     the ALJ shall provide accurate hypotheticals to the VE, if such testimony is warranted.

2

3                                          **VI.**

4                         **<u>REMAND FOR FURTHER PROCEEDINGS</u>**

5         The Court has discretion to remand or reverse and award benefits.  <u>McAllister v. Sullivan</u>,

6     888 F.2d 599, 603 (9th Cir. 1989).   Where no useful purpose would be served by further

7     proceedings, or where the record has been fully developed, it is appropriate to exercise this

8     discretion to direct an immediate award of benefits.  <u>See</u> <u>Lingenfelter</u>, 504 F.3d at 1041; <u>Benecke</u>,

9     379 F.3d at 595-96.   Where there are outstanding issues that must be resolved before a

10    determination can be made, and it is not clear from the record that the ALJ would be required to

11    find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  <u>See</u>

12    <u>Benecke</u>, 379 F.3d at 593-96.

13         Here, there are outstanding issues that must be resolved before a final determination can

14    be made.   In an effort to expedite these proceedings and to avoid any confusion or

15    misunderstanding as to what the Court intends, the Court will set forth the scope of the remand

16    proceedings.  First, because the ALJ failed to provide specific, clear and convincing reasons for

17    discounting plaintiff's subjective symptom testimony, the ALJ on remand shall reassess plaintiff's

18    subjective allegations and either credit her testimony as true, or provide specific, clear and

19    convincing reasons, supported by substantial evidence in the case record, for discounting or

20    rejecting her testimony.  To the extent the ALJ's reconsideration of plaintiff's credibility impacts the

21    evaluation of the medical findings and opinions of plaintiff's treating physicians, Dr. Metyas and

22    Dr. Guntupalli, or the ALJ's evaluation of any functional limitations caused by plaintiff's anxiety,

23    medication side effects, and rheumatoid arthritis, it is not the Court's intent to limit consideration

24    of these issues.   Second, the ALJ shall reassess the lay witness testimony and Third Party

25    Function Report of Harold Hicks and provide reasons germane to the witness for discounting Mr.

26    Hicks' statements, if warranted.   Third, the ALJ shall reconsider all of plaintiff's limitations in

27    making his RFC determination.   Thereafter, with the assistance of a VE, if such testimony is

28

warranted, the ALJ shall proceed to step five to determine whether there are jobs existing in significant numbers in the national economy that plaintiff can still perform.[23]

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: APRIL 9, 2015

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[23] Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to her past relevant work.